979 F.2d 852
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sami EISBART, Defendant-Appellant.
 No. 91-6242.
 United States Court of Appeals, Sixth Circuit.
 Nov. 10, 1992.
 
 Before KEITH and BATCHELDER, Circuit Judges, and HOOD,* District Judge.
 PER CURIAM:
 
 
 1
 Appellant Sami Eisbart ("Eisbart") appeals the sentence imposed in his conviction for conspiracy in violation of 18 U.S.C. § 371 (18 U.S.C. §§ 1341 & 1343); wire fraud, aiding and abetting, in violation of 18 U.S.C. §§ 1343, 2; and mail fraud, aiding and abetting, in violation of 18 U.S.C. §§ 1341, 2. A jury convicted Eisbart on ninety-three (93) counts of a ninety-five (95) count indictment. The district court sentenced Eisbart as follows:
 
 
 2
 As to Counts 1, 2, and 3, the defendant is sentenced to five (5) years on each count to run consecutive to each other for a total of 15 years. As to the remaining counts ..., the defendant is sentenced to five years on each count, said sentence to run concurrent with each other count and concurrent with the fifteen years in Counts 1, 2 & 3; for a total sentence of fifteen (15) years incarceration.
 
 
 3
 For the reasons stated below, we AFFIRM.
 
 I.
 
 4
 Eisbart, John E. Keller, John T. Kilpatrick, and William A. Todd, along with three corporations, National Coal Exchange, Inc. ("NCE"), Tennessee River Coal Co. ("Tennessee River Coal")[1], and Carbonex, Inc. ("Carbonex"), participated in an elaborate scheme to sell fraudulent "coal futures" to members of the public from 1979 to 1981. Eisbart and his co-conspirators developed a plan to convince potential investors that coal was a commodity and that so-called "coal futures" contracts could be bought and sold like other tangible commodities, such as gold, wheat, or corn. The scheme's success or failure depended on its ability to circumvent or avoid regulations of the Commodities Futures Trading Commission ("CFTC"), the Securities and Exchange Commission ("SEC"), and other state regulations.
 
 
 5
 The plan evisioned the sale of "coal futures" to the general public by telephone solicitations. During the fraudulent solicitation, the salesperson would tell the potential investor that he was only required to invest a percentage of the "coal futures" contract price as a deposit to hold the coal contract for one year. The salesperson would then inform the investor that, at the end of that one year, a corporation, utility, or other entity, termed a "legitimate end user", would purchase the investor's contract at an increased market rate and take delivery of the coal. The legitimate end user would pay the balance of the investor's coal futures contract, and the investor would receive a profit totalling the difference between the original contract price and the increased price paid by the legitimate end user.
 
 
 6
 The idea of investing in coal was attractive in the early 1980's, given the energy crisis in the United States. Although the scheme did not mirror typical practices in the coal industry, the pitch given by the telephone salesmen was contrived by Eisbart and was designed to relay a sense of urgency to the investor so that he would invest before having the chance to scrutinize the particular transaction or the overall operation.
 
 
 7
 Eisbart secured the legal representation of Robert Kassel to set up the NCE and implement this scheme. Eisbart, Kilpatrick, and Jim Evans divided the stock in the NCE among themselves 25%, 25%, 50%, respectively. Attorney Kassel also enlisted the services of Carbonex, ostensibly as their coal supplier. Carbonex mined coal in Dayton, Tennessee. Although the state of Tennessee revoked Carbonex's mining permit in July 1980, Carbonex reincorporated under the name of Tennessee River Coal Company to continue the appearance of unimpeded operation.
 
 
 8
 Eisbart and his co-conspirators then leased office space in New York City and Memphis, Tennessee, from which they ran the sales and day-to-day operations, respectively. After a short period of time, more than one dozen sales agencies had been established across the country, employing sixteen to forty salesmen at any given time to solicit investors for the coal futures contracts.
 
 
 9
 Eisbart's role in the conspiracy is well documented. He first was responsible for answering any customer inquiry regarding the validity of the investment. Also, under his supervision, the NCE administered the receipt and distribution of the money received. The NCE divided this money into three portions. The sales agencies received forty percent (40%); Tennessee River Coal Company received forty-two percent (42%) of the amount but rebated fifteen (15%) to NCE; and NCE retained the balance to be divided among Evans, Eisbart, and Kilpatrick.
 
 
 10
 When discord arose between Eisbart and Evans, Eisbart and Kilpatrick purchased Evans' shares in the business, vesting full control of NCE's day-to-day operations in Eisbart. Once Eisbart was given full control, he devised a further scheme to give the impression of rapidly fluctuating prices on the fabricated coal commodities market. This information was disseminated to the various agencies, and the salespersons were then able to predicate a rise in coal prices over the next several days. Again, these representations were designed to further entice investors into making a substantial investment into the fraudulent coal futures contracts.
 
 
 11
 The CFTC brought suit in 1980 to enjoin the sale of these contracts. The NCE continued to sell the contracts, however, during the pendency of the suit. To pacify the CFTC, Eisbart and his associates put together a sales manual and held various training sessions for their sales personnel. The manual contained obselete information, and was almost completely antithetical to the actual practice of the salespersons under the tutelage of Eisbart and his associates.
 
 
 12
 Following several complaints to the Michigan Better Business Bureau, Harold Slone, part owner of Tennessee River Coal, solicited the services of Anthony Todd to address the credibility problems that the NCE was beginning to encounter. Todd, who had been a judge and respected attorney in Memphis, agreed to accept a salary and a purchase transfer of a substantial amount of NCE stock as compensation for a position within the firm.
 
 
 13
 Discord soon arose over the distribution of money between Eisbart, Slone and Keller, owners of Tennessee River Coal Company. Eisbart demanded that NCE's share of the profits be increased. Several meetings took place, and following a Memphis meeting, attended by Todd, Kilpatrick, Slone, Keller, and Eisbart, Eisbart relinquished control of the NCE.
 
 
 14
 As these contracts became due at the beginning of 1981, the investors began to inquire about when they would receive a return for their investment. No purchasers for their contracts existed, and NCE attempted to provide an outdated coal brokers list which proved useless. The NCE then attempted to induce each investor to extend his investment for eighteen months for an additional fee. The salespersons were able to extend approximately fifty to sixty percent (50-60%) of the contracts between February and May of 1981, by promising the investors a greater return for their initial investment.
 
 
 15
 In August of 1981, the CFTC was granted an injunction and the National Coal Exchange ceased operations. By this time, the NCE had defrauded investors of $6,235,452.53.
 
 
 16
 On October 4, 1984, a Federal Grand Jury for the Western District of Tennessee indicted Eisbart, Keller, Kilpatrick, Todd, the NCE, Tennessee River Coal, and Carbonex in a ninety-five count indictment on various charges stemming from the fraudulent coal futures contract scheme. Later, the corporate defendants were dismissed from the cause. Keller pleaded guilty. Todd, Kilpatrick and Eisbart proceeded to trial.
 
 
 17
 On May 28, 1985, trial commenced. Todd and Kilpatrick were represented by counsel, but Eisbart refused to accept appointed counsel and acted pro se. During the last week of trial, after cross examination by the prosecution, Eisbart fled the jurisdiction. On August 2, 1985, following nine weeks of trial, the jury returned guilty verdicts for Eisbart, Todd and Kilpatrick.
 
 
 18
 Eisbate was eventually captured and returned to the jurisdiction. The district court sentenced him to serve a sentence of five years on each of counts 1, 2, and 3 of the indictment, to run consecutively. On each of the other counts, the court sentenced him to five years each to run concurrently with one another and with counts 1, 2, and 3. Eisbart was sentenced to a total of fifteen years. This timely appeal followed.
 
 II.
 
 19
 On appeal, Eisbart contends that his sentence is unfair because the district court sentenced him to serve more time than his co-conspirator Kilpatrick, who Eisbart claims had an equal role in the conspiracy. The district court sentenced Kilpatrick to "imprisonment for a period of FIVE (5) YEARS as to Counts 1 through 47 (excluding count 22); and FIVE (5) YEARS as to Counts 48 through 95 (excluding count 94); to run CONSECUTIVE for a TOTAL of TEN (10) YEARS." Because the district court sentenced Eisbart within the statutory, pre-guideline range, we AFFIRM the sentence imposed by the district court.
 
 
 20
 This Court, before the advent of the sentencing guidelines, traditionally gave a district judge broad discretion to determine what sentence to impose. United States v. Barbara, 683 F.2d 164, 166 (6th Cir.1982). Accordingly, most sentences were characterized as unreviewable. We have recognized the following two exceptions to the "unreviewability rule": "(1) reliance upon erroneous or improper factors or information in sentencing so as to amount to a gross abuse of discretion; and (2) failure to evaluate the sentencing information submitted, or total failure to exercise discretion." Id. See also, United States v. Fraser, 709 F.2d 1556, 1559-60 (6th Cir.1983).
 
 
 21
 Eisbart brings no evidence to light that would indicate that the district court relied on any erroneous or improper factors or information that amounts to a gross abuse of discretion. Eisbart merely asserts that, because he fled the jurisdiction for six years before he received his sentence, the district court imposed a harsher sentence on him than on his co-conspirator Kilpatrick. This argument ignores the sentencing hearing transcript in which the district court enumerates the factors it considered in imposing the fifteen-year sentence on Eisbart. The district court's use of each of those factors is proper, and does not come even marginally close to the level of gross abuse prohibited by this Court.
 
 
 22
 Moreover, the record is devoid of any indication that the district court failed to take account of any pertinent information when it sentenced Eisbart. Eisbart simply makes a comparison to the sentence received by co-conspirator Kilpatrick and states that his sentence is unfair given the role that Kilpatrick played in the scheme. The evidence presented does indicate that Eisbart played a more significant role in the development and implementation of the fraudulent coal futures scheme than Kilpatrick. The evidence further indicates that Eisbart seemingly had complete authority over the course which the NCE and its sales representatives would take. Furthermore, this is not "an exceptional case, where the facts point convincingly to the conclusion that the district court has, without any justification, arbitrarily singled out a minor defendant for the imposition of a more severe sentence than that imposed upon the co-defendants...." United States v. Gagano, 338 F.2d 893, 897 (6th Cir.1964) (citing United States v. Wiley, 278 F.2d 500 (7th Cir.1960)).
 
 III.
 
 23
 For the foregoing reasons, we AFFIRM the sentence imposed by the Honorable Julia Smith Gibbons, United States District Judge for the Western District of Tennessee.
 
 
 
 *
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 Tennessee River Coal Company, formerly Carbonex, Inc., was owned by Harold Slone and John Keller